J-S21004-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| . | |
| APPEAL OF: R.M. | |
| | No. 524 WDA 2016 |

Appeal from the Order February 23, 2016
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP25JV 0007 of 2016

BEFORE:  LAZARUS, J., DUBOW, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 12, 2017**

R.M. appeals from the dispositional order,[1] entered in the Court of Common Pleas of Erie County, after he was adjudicated delinquent for burglary (F-2),[2] criminal trespass (F-3),[3] receiving stolen property of a motor vehicle (M-3),[4] simple assault (M-2),[5] resisting arrest (M-2),[6] theft by

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Our standard of review of dispositional orders in juvenile proceedings is well settled.  "The Juvenile Act grants broad discretion to the court when determining an appropriate disposition. We will not disturb a disposition absent a manifest abuse of discretion." ***In re R.D.R.***, 876 A.2d 1009, 1013 (Pa. Super. 2005).

[2] 18 Pa.C.S. § 3502(a).

[3] 18 Pa.C.S. § 3503(a).

[4] 18 Pa.C.S. § 3925(a).
*(Footnote Continued Next Page)*

unlawful taking (M-3),[7] and disorderly conduct.[8]  R.M. was ordered to be placed at Loysville Youth Development Center for 2 to 3 months, with possible transition to George Junior Republic if R.M. was on positive status at Loysville.  R.M. was also ordered to pay $1,361.00 in restitution to the victim.  After careful review, we affirm.

On January 18, 2016, at 1:00 a.m., Erie Police Officer Gabriel A. Carducci spotted a late-model, white Ford Explorer that had been reported stolen within the past few days.  The officer, who was on routine patrol, followed the Explorer and was ultimately able to catch up with it by following the vehicle's tracks in the fresh snow.  Officer Carducci radioed for backup, reporting that he was following the stolen vehicle.  When another police officer crossed paths with the Explorer, the Explorer began to rapidly accelerate.  Officer Carducci activated his emergency lights and sirens and continued to follow the Explorer, which attempted to evade the police by going through traffic lights and stop signs at a speed in excess of 50 miles per hour in a posted 25 miles per hour speed zone.  Ultimately, the driver of

*(Footnote Continued)* ————————————

[5] 18 Pa.C.S. § 2701(a)(1).

[6] 18 Pa.C.S. § 5104.

[7] 18 Pa.C.S. § 3921(a).

[8] 18 Pa.C.S. § 5503(a)(4).

the vehicle lost control of the car and hit a tree. The driver and passenger, R.M., exited the vehicle and fled from the police on foot.

Officer Nicholas Bernatowicz gave chase to R.M. as he ran south from the accident site. Officer Bernatowicz repeatedly told R.M. to stop; he refused to comply. The officer followed R.M.'s footprints in the snow for a block and a half, which included traversing through a backyard, over two fences, and down an alley. The officer finally apprehended R.M. in a single-car detached garage. The officer told R.M. to show his hands, observing that he had a black object in his right hand. R.M. failed to comply, stood at a "bladed stance" and, at one point, completely turned his back to the officer. Officer Bernatowicz approached R.M., grabbed hold of him, and struggled with him. R.M. resisted arrest and struck the officer in the right knee. With the help of a second officer, R.M. was handcuffed. A search incident to arrest uncovered multiple items on R.M.'s person, including a prescription pill bottle belonging to the victim.

At the delinquency hearing, the victim testified that she had never given R.M. permission to use her vehicle and that she had reported her car stolen two days prior to the instant incident. The owner of the single-family home with the detached garage testified that she had not given R.M. permission to be on her property or in her garage. R.M. testified that he knew the Explorer was stolen, that he was a passenger in the stolen vehicle, that he possessed the victim's prescription pill bottle, and that he had tried to "get away" from the officers as they chased him.

Following the delinquency hearing, the court concluded that, based on the evidence, the Commonwealth had proven, beyond a reasonable doubt, that R.M. had committed the crimes of receiving stolen property, aggravated assault, burglary, criminal trespass, resisting arrest, disorderly conduct, and theft by unlawful taking.[9] R.M. filed a motion to reconsider his adjudication for receiving stolen property in light of the fact that he was the passenger, not the driver, of the stolen vehicle.[10] After hearing arguments, the court denied the motion. The court amended the charge of aggravated assault to simple assault and adjudicated R.M. delinquent, finding that he was in need of treatment, supervision, and rehabilitation. R.M. filed post-dispositional motions that were denied.

R.M. filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. R.M. raises the following issues for our review:

> (1) Whether the verdict of the trial court goes against the sufficiency of the evidence because (a) [R.M.] did not have the intent to commit the crime of Burglary, the crime of Criminal Trespass, and Receiving Stolen Property of a Motor Vehicle and/or (b) the evidence does not substantiate an adjudication of delinquency on the

---

[9] The court found that receiving stolen property merged with theft by unlawful taking for disposition purposes.

[10] *See In the Interest of Scott*, 566 A.2d 266 (Pa. Super. 1989) (joint and constructive possession of stolen vehicle found where juvenile passenger fled on foot after police stopped car and was apprehended; evidence showed defendant acted in concert with driver of stolen vehicle).

aforementioned allegations of delinquency and/or the Commonwealth cannot meet the "beyond a reasonable doubt" burden of proof for purposes of the aforementioned allegations of delinquency.

(2)     Whether the trial court erred at the time of disposition when it determined that [R.M.'s] best placement option was Loysville Youth Development Center (YDC) near Loysville, Pennsylvania, which is further from the Juvenile's home county than other placements that could accomplish the same "treatment, supervision and rehabilitation" goals such as George Junior Republic near Grove City, Pennsylvania, especially in this particular case as Juvenile's mother and sisters visited Juvenile on a daily basis while Juvenile was detained and/or the denial process was ongoing.

(3)     Whether the trial court erred when it determined that [R.M.] owed restitution for damages to the motor vehicle, for damages to any tangible property located within the motor vehicle, and/or for damages to any tangible property not located in the motor vehicle especially with the trial court's finding that [R.M.] was adjudicated delinquent at receiving stolen property.[11]

After a careful review of the parties' briefs, case law and the certified record, we conclude that the trial court correctly disposes of R.M.'s first two issues on appeal that concern the sufficiency of the evidence and

---

[11] **See** 42 Pa.C.S. § 6352(a)(5) (delinquent child may be ordered to pay "reasonable amounts of money as fines, costs, fees or restitution as deemed appropriate as part of the plan of rehabilitation considering the nature of the acts committed and the earning capacity of the child, including a contribution to a restitution fund"); **see also In the Interest of J.G.**, 45 A.3d 1118, 1122 (Pa. Super. 2012) (under Juvenile Act, "a court has the authority to award restitution where a minor has been adjudicated delinquent. The court also enjoys broad discretion when deciding whether to impose restitution as part of the overall goal of apportioning responsibility and accountability, subject to the child's ability to pay.").

determination of an appropriate placement facility for R.M.  Accordingly, we rely upon the opinion, authored by the Honorable John J. Trucilla, in affirming these issues on appeal.  We instruct the parties to attach a copy of Judge Trucilla's decision in the event of further proceedings in the matter.

In his final claim on appeal, R.M. asserts that the trial court erred in ordering him to pay restitution with regard to the stolen vehicle (and its missing contents).  R.M. contends that the Commonwealth did not provide any evidence that he was responsible for the damaged car or the items stolen from it, that he was not responsible for these losses because he was not the driver of the car, and that there was no proof that he was in control of any of the lost items.

R.M. was properly held accountable for the damage to the victim's property, which included the items stolen from her vehicle.  Here, there was a causal connection between the total losses sustained by the victim and R.M.'s role in the burglary and receipt of the victim's stolen property, including the missing contents of her vehicle.  *Cf. Commonwealth v. Reed*, 543 A.2d 587 (Pa. Super. 1988) (restitution cannot be ordered for property Commonwealth has not proven was either stolen or recovered by defendant).  The court properly balanced the need to hold R.M. responsible for the losses with his rehabilitative needs and ability to pay.  *See In the Interest of M.W.*, 725 A.2d 729, 732-33 (Pa. 1999) (juvenile court invested with "broad measure of discretion to apportion responsibility for

damages based upon the nature of the delinquent act and the earning capacity of the juvenile.").

In cases where multiple juveniles are responsible for a victim's losses, a court should consider the "proportion of the damage caused by" each juvenile. **In the Interest of Dublinski**, 695 A.2d 827 (Pa. Super. 1997). Here, the trial court appropriately apportioned the damages[12] caused by each of the responsible juveniles, R.M. and the driver of the victim's stolen vehicle, when calculating the restitution award. In fact, the court decreased the initial restitution amount ($1,620.99) to further reflect the appropriate proportion of R.M.'s accountability ($1,361.00) after reducing the value of the items.[13] **See** N.T. Dispositional Hearing, 2/23/16, at 38; Order, 2/25/16 (upon consideration of facts at dispositional hearing court concludes that restitution amount of $1,361.00 "represents the fair and reasonable amount for [R.M.] to pay . . . based on a review of the police reports and in the interest of justice."). Under these circumstances, we conclude that the trial

_____

[12] Although R.M. does not claim that the Commonwealth did not provide proof of the value of the stolen items, we note that it did provide receipts to support the value of the items. **See** N.T. Dispositional Hearing, 2/23/16, at 10-12.

[13] The total loss to the victim was calculated to be $3,241.99. This included the damage to the vehicle, and several items never recovered from the vehicle (jewelry, two booster seats, 40 caliber clip with ammunition, two DS XL hand games, two RCA portable televisions, and kids' games).

court's restitution order, which is supported in the record, was not a manifest abuse of discretion. ***In the Interest of J.G.***, ***supra***.

Order affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2017

IN THE INTEREST OF             : IN THE COURT OF COMMON PLEAS
R.M.                               : OF ERIE COUNTY, PENNSYLVANIA
                                     : JUVENILE DIVISION – DELINQUENCY
A Minor                          : No.   7 of 2016

## MEMORANDUM OPINION

**July 1, 2016:** This matter is before the Court upon the appeal of R.M. (hereinafter "Appellant") from this Court's Order dated March 9, 2016. For the reasons set forth below, the appeal should be dismissed.

## FACTUAL & PROCEDURAL HISTORY

### A.     Procedural History

On January 19, 2016, the Commonwealth filed Allegations of Delinquency against Appellant charging him with the following delinquent acts: Allegation 13, Aggravated Assault (in violation of 18 Pa. C.S. § 2702(a)(3)); Allegation 14, Burglary (in violation of 18 Pa. C.S. § 3502(a)(4)); Allegation 15, Criminal Trespass (in violation of 18 Pa. C.S. § 3503(a)(1)(i)); Allegation 16, Receiving Stolen Property (in violation of 18 Pa. C.S. § 3925(a)); Allegation 17, Resisting Arrest or Other Law Enforcement (in violation of 18 Pa. C.S. § 5104); Allegation 18, Theft by Unlawful Taking or Disposition (in violation of 18 Pa. C.S. § 3921(a)); Allegation 19, Receiving Stolen Property (in violation of 18 Pa. C.S. § 3925(a)); and Allegation 20, Disorderly Conduct (in violation of 18 Pa. C.S. § 5503(a)(4)).

A Delinquency Hearing was scheduled before the Honorable Daniel J. Brabender for January 26, 2016. On January 22, 2016, Appellant, represented by Jason A. Checque, Esquire, filed a Motion to Continue, seeking to continue the Delinquency Hearing due to a scheduling conflict and additional time needed to gather medical records and interview witnesses. Judge

31

Brabender granted Appellant's Motion to Continue, and a Delinquency Hearing was scheduled for February 4, 2016 at 1:30 p.m. before this Court.

On February 4, 2016, the day of the Delinquency Hearing, Appellant filed another Motion to Continue, seeking to continue the Delinquency Hearing due to Appellant's medical appointment at 2:30 p.m. This Court denied Appellant's Motion to Continue. However, this Court spoke with Appellant's medical personnel and agreed to make Appellant available between 3:00 p.m. and 3:30 p.m. so that Appellant could attend his medical appointment.

Accordingly, the Delinquency Hearing was held on February 4, 2016. The Commonwealth, represented by Jonathan W. Neenan, Esquire, called its first two witnesses, Officer Gabriel Carducci and Officer Nicholas Bernatowicz. After the two officers testified, the Court recessed and the trial was continued so that Appellant could attend his scheduled medical appointment. On February 11, 2016, the Court reconvened. The Commonwealth called Officer Jason Russell and the victims, Destiny Belle and Latasha Barnett. Following this testimony, the Commonwealth rested its case. Counsel for Appellant made a Motion for Judgment for Acquittal for Allegation 14, Burglary and Allegation 16, Receiving Stolen Property. The Court denied Appellant's request and the matter proceeded.

The Court subsequently conducted a colloquy with Appellant concerning his constitutional rights, including his right not to testify. Appellant informed the Court of his desire to testify on his own behalf and forego his constitutional right to remain silent. The Court found that Appellant knowingly and voluntarily waived his right not to testify. Following Appellant's testimony, Appellant rested. Both Appellant and the Commonwealth made a closing statement.

Following the conclusion of the Delinquency Hearing, the Court stated its findings of fact on the record. The Court did not find the testimony of Appellant credible. The Court found that

2

Commonwealth's witnesses were credible. The Court found that the Commonwealth had proven beyond a reasonable doubt that Appellant had committed: Allegation 13, Aggravated Assault; Allegation 14, Burglary; Allegation 15, Criminal Trespass; Allegation 17, Resisting Arrest or Other Law Enforcement; Allegation 18, Theft by Unlawful Taking or Disposition; and Allegation 20, Disorderly Conduct. The Court held that Allegation 19, Receiving Stolen Property, merged with Allegation 18, Theft by Unlawful Taking or Disposition. The Court held in abeyance its ruling on Allegation 16, Receiving Stolen Property, to allow counsel for Appellant the opportunity to submit a brief on the issue of whether a person who is a passenger in a stolen vehicle could commit the crime of Receiving Stolen Property with respect to the stolen vehicle.

On February 17, 2016, Counsel for Appellant submitted a Motion to Reconsider Adjudication(s) of Delinquency. In addition to addressing the issue relating to Allegation 16, Receiving Stolen Property as it related to being a passenger in a stolen vehicle, Appellant also asked this Court to reconsider Allegation 13, Aggravated Assault; Allegation 14, Burglary; and Allegation 15, Criminal Trespass.

A Dispositional Hearing was held on February 23, 2016. The Court heard arguments from Appellant and the Commonwealth regarding Appellant's Motion to Reconsider Adjudications of Delinquency. The Court sustained its findings that Appellant committed Allegation 14, Burglary and Allegation 15, Criminal Trespass. The Court further found that the Commonwealth had proven beyond a reasonable doubt that Appellant committed Allegation 16, Receiving Stolen Property. This Court granted Appellant's request regarding Allegation 13 and thereby amended Aggravated Assault to Simple Assault. After considering the Court Summary and statements of the parties, the Court then found Appellant in need of treatment, supervision,

3

and rehabilitation and, consequently, adjudicated him delinquent. The Court ordered Appellant to be placed at Loysville Youth Development Center (hereinafter "Loysville") for two to three months, with a possible transition to George Junior Republic if Appellant was on positive status at Loysville. Also the Court ordered Appellant to pay $1,620.99 in restitution. In an Order dated February 25, 2016, the Court modified its previous Order and thereby ordered Appellant to pay restitution in the amount of $1,361.00.

On March 4, 2016, Appellant filed Post Dispositional Motions, which included a "Motion to Reconsider Juvenile's Motion to Reconsider Adjudications of Delinquency," "Motion for [sic] Reconsider Juvenile to Pay Restitution," and "Motion to Reconsider Placement at Loysville YDC." On March 8, 2016, this Court issued an Order denying Appellant's Motions.

Appellant filed the instant Notice of Appeal on April 8, 2016.[1] On April 19, 2016, this Court ordered Appellant to file a concise statement of matters complained of on appeal, pursuant to Pa. R.A.P. 1925(b), within twenty-one days. On May 11, 2016, Appellant filed his "Statement of Matters Complained of on Appeal."

The Court will now address the relevant facts of the instant case.

## B.  Factual History

The Commonwealth first called Officer Gabriel A. Carducci, a patrolman with the City of Erie Police Department, to testify. *Delinquency Hearing Transcript* (hereinafter "D.H.T."), February 4, 2016 at 4-5. Officer Carducci testified that while working third shift at approximately 1:00 a.m. on Monday, January 18, 2016,[2] during a routine patrol in the City of Erie, he spotted a late model white Ford Explorer at West 18th Street and Liberty Street. *Id.* at 6,

---

[1] This Court was not, however, served a copy of the Notice of Appeal until April 19, 2016, eleven days after the Notice of Appeal was filed and Counsel for Appellant certified that he served this Court.

[2] The Court takes judicial notice that Monday, January 18, 2016 was Martin Luther King, Jr. Day.

4

12, 37. The Ford Explorer matched the description of a vehicle that had been reported stolen within the previous few days. *Id.* at 6. Officer Carducci testified that the description of the vehicle had been given to him on roll call for several days. *Id.* Officer Carducci turned his police cruiser around so he could follow the Ford Explorer. *Id.* at 6-7. By the time he turned around, the Ford Explorer was no longer visible. *Id.* at 7. On this particular late evening and early morning, there had been a severe snow storm, and Officer Carducci was able to catch up to the Ford Explorer by following the vehicle's tracks in the fresh snow. *Id.* Due to the inclement weather and early morning hours, there were not many vehicles on the road and it was therefore easier to follow the tracks of the Ford Explorer. *Id.* at 12-13, 37. Officer Carducci spotted the Ford Explorer again at 20th Street and Sassafras Street within five minutes. *Id.* at 7. He began following the vehicle, and called on the radio to report he was following a vehicle matching the description of the Ford Explorer that had been reported stolen. *Id.* Another Erie Police Department vehicle occupied by Office Nicholas Bernatowicz crossed paths with the Ford Explorer on State Street, and the Ford Explorer began to rapidly accelerate. *Id.* at 8-9. Officer Carducci activated his emergency lights and sirens as he continued to follow the Ford Explorer. *Id.* at 10. In an apparent attempt to evade police, the Ford Explorer went through traffic lights and stop signs at a speed of upwards of fifty miles per hour in a twenty-five mile per hour zone. *Id.* at 11, 14. At 245 East 22nd Street, the driver of the vehicle lost control, hit a tree, and the Ford Explorer came to a stop. *Id.* at 14.

Officer Carducci observed two people exit the vehicle: a driver, who went northbound, and a front seat passenger, who went southbound. *Id.* at 14-15. Officer Carducci exited his vehicle and chased the driver of the vehicle. *Id.* at 15. Officer Bernatowicz gave chase to the passenger of the vehicle. *Id.* Officer Carducci apprehended the driver of the vehicle, J.G. *Id.* at

5

16. Officer Carducci returned to the Ford Explorer, and was able to identify the owner of the vehicle as Latasha Barnett. *Id.* at 17-18. He also verified that this Ford Explorer was the same vehicle that had been reported stolen by using the vehicle's identification number. *Id.* at 18. Finally, Officer Carducci testified that Appellant's booking sheet listed the items Appellant had on his person, which included a prescription pill bottle for Venlafaxine belonging to Latasha Barnett. *Id.* at 34.

The Commonwealth next called Officer Nicholas Bernatowicz, a patrolman and SWAT operator with the City of Erie Police Department. *Id.* at 43-44. Officer Bernatowicz testified that he responded to Officer Carducci's radio call around 1:00 a.m. while he was working third shift. *Id.* at 46. He was on East 24th Street headed toward State Street. *Id.* at 46-47. Officer Bernatowicz saw the Ford Explorer coming down the hill on State Street as he went through the intersection of State Street and East 24th Street. *Id.* at 47. Officer Bernatowicz saw that there were two black males in the vehicle, and identified Appellant as the person sitting in the front passenger seat. *Id.* at 47-48. The Ford Explorer went through the intersection without stopping, and began to accelerate at a high rate of speed. *Id.* at 49. Officer Bernatowicz turned his vehicle around, turned on his emergency lights and siren, and pursued the Ford Explorer. *Id.* at 49, 62. Officer Carducci's vehicle was directly behind the Ford Explorer, and Officer Bernatowicz's vehicle was directly behind Officer Carducci's vehicle. *Id.* at 49-50. Officer Bernatowicz observed the Ford Explorer lose control and hit a tree. *Id.* at 50. As Officer Bernatowicz was pulling up to the scene of the crash, he saw two people exit from the vehicle. *Id.* at 50, 64. As the driver ran north and Appellant ran south, Officer Bernatowicz pursued Appellant and Officer Carducci followed the driver. *Id.* at 50-51.

6

Officer Bernatowicz cleared the Ford Explorer and found no other occupants. *Id.* at 51, 64. Next, Officer Bernatowicz, in full police uniform, gave chase to Appellant. *Id.* at 51, 57. Officer Bernatowicz gave Appellant verbal commands to stop, but Appellant did not comply. *Id.* at 51. Instead, Appellant ran south toward an alley. *Id.* Appellant was ahead of Officer Bernatowicz, but Officer Bernatowicz was able to follow Appellant because he could easily identify Appellant's footprints in the recent snowfall. *Id.* at 52. Officer Bernatowicz followed the footprints west through a backyard, over two fences, and through an alley. *Id.* at 51-52, 65. In the alley, the footprints led to a vehicle with an open door, and went in one side and out the other. *Id.* at 51-52, 65, 67. Officer Bernatowicz cleared the open vehicle with the help of Officer Jason Russell who joined him in the pursuit of Appellant at the open vehicle. *Id.* at 51. The Officers continued to follow the footprints over fences, across a park, and ultimately to a single car detached garage located at 2224 Holland Street. *Id.* at 52, 65, 69. Officer Bernatowicz testified that Appellant did not live at 2224 Holland Street. *Id.* at 61. In total, the Officer Bernatowicz pursued Appellant for one and a half to two blocks. *Id.* at 51-52, 66. At no point during the chase did Appellant stop, despite being pursued by two uniformed police officers and their repeated verbal commands. *Id.* at 67.

The footprints led into the garage. *Id.* at 52. Officer Bernatowicz gave Appellant commands from outside the garage to show his hands. *D.H.T.,* February 11, 2016 at 10, 21. As he did not receive a response, Officer Bernatowicz went through the partially open man door to the garage with his weapon drawn and turned left. *D.H.T.,* February 4, 2016 at 53, 68. The garage was pitch black, but Officer Bernatowicz had a flashlight attached to his weapon. *Id.* at 53, 55, 74. Appellant was standing in the left corner of the garage. *Id.* at 53. Officer Russell entered the garage after Officer Bernatowicz. *Id.* at 53, 71-72. Officer Bernatowicz testified that

7

Appellant was six to seven feet away, had a black object in his right hand, and stood at a "bladed stance" with half his body turned away from Officer Bernatowicz. *Id.* at 54-55, 69, 72-73. Officer Bernatowicz repeatedly commanded Appellant to show him his hands. *Id.* at 55. Appellant failed to comply, turned his back towards Officer Bernatowicz, and reached towards the waistband of his pants.[3] *Id.* at 55, 71. Officer Bernatowicz re-holstered his weapon, approached Appellant, and grabbed ahold of him. *Id.* at 56. Appellant attempted to get free from Officer Bernatowicz's grasp and to escape through the man door. *Id.* at 56, 77. Officer Bernatowicz could feel force as Appellant struggled and resisted arrest, ultimately striking Officer Bernatowicz in the right knee. *Id.* at 56-57, 77-78. Officer Bernatowicz got Appellant to the ground, where Appellant continued to struggle and tried to break free. *Id.* at 57, 80. Appellant moved his hands underneath him, in a further attempt to resist arrest. *Id.* at 57. With the help of Officer Russell, Officer Bernatowicz was able to get Appellant's hands behind his back and handcuff him. *Id.* at 57-58, 80. While Appellant was on the ground, Officer Bernatowicz gave him repeated commands to stop resisting, to release his hands from under his body, and to let go of objects he was holding. *Id.* at 58. Officer Bernatowicz and Officer Russell conducted a search incident to arrest of Appellant. *Id.* at 59-60. They recovered multiple items, including a prescription pill bottle that was found in Appellant's left pocket. *Id.* at 60. The booking sheet indicated that the pill bottle contained Venlafaxine belonging to Latasha Barnett. *Id.* at 34.

The Commonwealth next called Officer Jason Russell, a patrolman with the City of Erie Police Department. *D.H.T.,* February 11, 2016 at 4. Officer Russell testified that on January 18,

---

[3] It is worthy to note that in spite of Appellant's conduct and level of defiance, Officer Bernatowicz established a factual predicate that may have warranted the use of deadly force. This Court recognized that this issue is thankfully not before the Court and it is only because of the sound judgment and exercised experience of a seasoned veteran. As noted, the Court found that the conduct of the officers, especially Officer Bernatowicz, was particularly commendable.

8

2016, he was working third shift. *Id.* at 5. He heard Officer Carducci's radio broadcast that the Ford Explorer was eluding him and joined in the pursuit. *Id.* at 5-6. Officer Russell heard on the radio that the Ford Explorer had crashed in the 200 block of East 24th Street and that both occupants had fled from the vehicle on foot. *Id.* at 6. He stopped his vehicle in the 200 block East 25th Street to establish a perimeter. *Id.* Officers Carducci and Bernatowicz were already at the scene. *Id.* Officer Russell assisted Officer Bernatowicz in the pursuit of the passenger of the Ford Explorer, and joined Officer Bernatowicz at the vehicle in the alley. *Id.* at 6-7. The Officers cleared the vehicle, and followed the footprints westbound. *Id.* at 7. Officer Russell testified that they scaled two fences and followed the footprints across Holland Street into a park, leading to a garage at 2224 Holland Street. *Id.* at 7-8. The footprints led to the garage's man door, located at the corner of the garage. *Id.* at 8.

Officer Russell heard Officer Bernatowicz give the individual inside the garage commands to show his hands while both officers were outside the garage. *Id.* at 21. As was testified to by Appellant, Appellant heard police voices outside of the garage but did not come out, and instead backed into the corner of the garage. *Id.* at 67-69. As no one exited the garage, Officer Bernatowicz entered the garage through the man door, followed by Officer Russell. *Id.* at 8. Officer Russell cleared the back corners of the garage as Officer Bernatowicz focused on the individual inside the garage. *Id.* at 8-9. Officer Russell heard Officer Bernatowicz ordering the individual to show his hands and get on the ground. *Id.* at 9-10. When Officer Russell finished clearing the back corners of the garage, he turned around and saw Officer Bernatowicz in contact with the individual. *Id.* at 23-24. Officer Russell identified R.M. as the individual in the garage at 2224 Holland Street. *Id.* at 9. Officer Russell testified that Officer Bernatowicz closed the distance between himself and R.M. and then grabbed Appellant in an attempt to

9

handcuff him. *Id.* at 10. Officer Russell testified that Appellant was not compliant, and that Appellant was trying to get through or around Officer Bernatowicz. *Id.* at 9. Officer Russell holstered his weapon and helped Officer Bernatowicz get Appellant to the ground. *Id.* Appellant struggled on the ground and resisted the officers. *Id.* Officer Russell got Appellant's left arm out from underneath him, while Officer Bernatowicz got Appellant's right arm out from underneath him, and the two were able to handcuff Appellant. *Id.* at 10-11. Officer Russell did not see any objects in Appellant's hand. *Id.* at 23. No weapons were found on Appellant or in the garage. *Id.* at 29. Officer Russell testified that he and Officer Russell performed a search incident to arrest of Appellant and found an orange pill bottle in Appellant's left pocket. *Id.* at 11-12. The pill bottle listed the name Latasha Barnett and identified the prescriptive drug as Venlafaxine. *Id.* at 18.

The Commonwealth then called Destiny Belle, the owner of the one-car garage located at 2224 Holland Street. *Id.* at 34-35. Ms. Belle testified that she was sleeping in the early morning hours of January 18, 2016, when her children woke her up because they saw, from their bedroom window, police officers outside of their garage. *Id.* at 35, 40-41. Ms. Belle testified that she knew Appellant because he was her son's friend and had been over to her house on multiple occasions. *Id.* at 36, 39. Ms. Belle had always given Appellant permission to come into her house, but had never given him permission to be in her garage at 1:00 a.m. *Id.* at 41-43. Ms. Belle testified that she had not given Appellant permission to be in her garage on January 18, 2016. *Id.* at 37. Ms. Belle testified that no one had permission to be in her garage that night, and that her garage was not open to the public nor was it abandoned. *Id.* at 35-36.

The Commonwealth called its last witness Latasha Barnett, the owner of the Ford Explorer. *Id.* at 44-45. Ms. Barnett testified that she owned a 2013 pearl white Ford Explorer.

10

*Id.* at 45. The Ford Explorer was titled in her name, with Maurice Martin, the father of her children, as the co-owner. *Id.* at 46, 55. Ms. Barnett reported her Ford Explorer stolen on January 16, 2016. *Id.* at 45. Ms. Barnett testified that the last time she saw the vehicle before it was stolen was at 12:00 a.m. on January 16, 2016 when it was parked in front of her house at 242 East 25th Street. *Id.* at 45-46. Ms. Barnett testified that she does not know Appellant. *Id.* at 46. Ms. Barnett stated that Mr. Martin had permission to use the vehicle, but that Appellant did not have permission to use the vehicle. *Id.* at 46, 56. Ms. Barnett had never seen Appellant before, and had not seen Appellant get into the vehicle. *Id.* at 49. Ms. Barnett testified that on January 18, 2016, she received a call from the City of Erie Police Department that they had recovered her vehicle. *Id.* at 45. When Ms. Barnett saw her Ford Explorer after January 18, 2016, it was totaled. *Id.* at 47. Ms. Barnett testified that she kept jewelry, car seats, two televisions, games, and her medication in her vehicle. *Id.* at 47-48. Ms. Barnett testified that she kept her medication in the center console of her vehicle. *Id.* at 49.

After the Commonwealth rested, Appellant waived his right to remain silent and testified in his own defense. *Id.* at 61, 65. Appellant admitted that he knew the Ford Explorer was stolen. *Id.* at 84. Appellant admitted that he was the passenger in the stolen Ford Explorer. *Id.* Appellant also admitted to possessing Ms. Barnett's prescription pill bottle for Venlafaxine. *Id.* at 79. Appellant admitted to knowing he was being chased by police officers from 24th Street and Sassafras Street. *Id.* at 83. Appellant further admitted that he was trying to "get away" from the officers. *Id.*

Despite having previously been to Ms. Belle's house, Appellant conceded that he did not have permission to be on her property at approximately 1:20 a.m. or in her garage. *Id.* Appellant testified that once inside the garage, he leaned on the man door for five to ten minutes before he

11

heard police voices outside. *Id.* at 67-69. Appellant heard commands and a police officer say "Is anyone inside the garage?" *Id.* at 69, 84. Appellant testified that he did not respond or go outside, but instead started to go towards the corner of the garage. *Id.* at 69, 82.

Appellant testified that three officers came into the garage. *Id.* at 69. Appellant identified Officers Bernatowicz and Russel as two of the officers that came into the garage. *Id.* at 70. Appellant did not provide a name for the third officer. *Id.* According to Appellant, all three officers had their weapons drawn. *Id.* at 69, 71-72. Appellant said that when the officers entered the garage, he put his hands up in the air and immediately got down on the ground. *Id.* at 71, 73. Appellant testified that Officer Russell picked him up off the ground and then threw him to the ground. *Id.* at 71. According to Appellant, the three officers proceeded to stomp on him, kick him, and punch him in his ribs. *Id.* Appellant testified that Officer Bernatowicz stomped on his right hand with his boot, and that the officers kicked him in his face. *Id.* at 74-75. Appellant denied striking any of the officers. *Id.* at 80. Appellant testified that police officers from the City of Erie Police Department took him to the hospital on January 18, 2016 and that his hand was broken. *Id.* at 76-77, 88-89. The Court questioned Appellant about this alleged police brutality. *Id.* at 85-87. The Court asked Appellant if he received any stitches, to which he replied no. *Id.* at 86. The Court asked Appellant if he broke any ribs, to which he replied no. *Id.* The Court asked if his eyes were swollen shut from being kicked in the face, and Appellant again responded no. *Id.* at 86-87. The Court did not find Appellant's testimony regarding the alleged police brutality credible. *Id.* at 111. The Court later found that the trauma to Appellant's right hand was a result of Appellant's struggle, defiance, and resistance to his arrest, not the result of police brutality. *Id.* at 114.

DISCUSSION

Appellant raises three issues on appeal. The Court will address each issue *in seriatim*.

## A.  Sufficiency of Evidence

In his first issue raised on appeal, Appellant states:

Appellant avers and believes that the verdict goes against the sufficiency of the evidence for the following allegations:

      a)  Appellant avers and believes that the trial court erred when it adjudicated Appellant delinquent and subsequently denied Appellant's Post-Dispositional Motions for Allegation 14 (Burglary) because Appellant did not have the intent to commit the crime of burglary and/or the evidence does not substantiate the crime of burglary and/or the Commonwealth cannot meet the "beyond a reasonable doubt" burden of proof for purposes of the aforementioned adjudication of delinquency;

      b)  Appellant avers and believes that the trial court erred when it adjudicated Appellant delinquent and subsequently denied Appellant's Post-Dispositional Motions for Allegation 15 (Criminal Trespass) because the Appellant did not have the intent to commit the crime of criminal trespass and/or the evidence does not substantiate the crime of criminal trespass and/or the Commonwealth cannot meet the "beyond a reasonable doubt" burden of proof for purposes of the aforementioned adjudication of delinquency; and

      c)  Appellant avers and believes that the trial court erred when it adjudicated Appellant delinquent and substantially denied Appellant's Post-Dispositional Motions for Allegation 16 (Receiving Stolen Property) because the Appellant did not have the intent to commit the crime of receiving stolen property and/or the evidence does not substantiate the crime of receiving stolen property and/or the Commonwealth cannot meet the "beyond a reasonable doubt" burden of proof for purposes of the aforementioned adjudication of delinquency.

App.'s 1925(B) Statement at ¶ 1.

The standard of review for a sufficiency of the evidence claim is well-settled:

The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the

Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014 (Pa. Super. Ct. 2002) (quoting *Commonwealth v. Hennigan*, 753 A.2d 245 (Pa. Super. Ct. 1996)) (internal citations and quotations omitted); *See also, Commonwealth v. Ratsamy*, 934 A.2d 1233, 1236 n.2 (Pa. 2007).

A person commits Burglary in violation of 18 Pa. C.S. § 3502(a)(4) when he "enters a building or occupied structure, or separately secured or occupied portion thereof that is not adapted for overnight accommodations in which at the time of the offense no person is present," with the intent to commit a crime therein. 18 Pa. C.S. § 3502(a)(4). It is a defense to Burglary if, at the time of the commission of the offense, the building or structure was abandoned, the premise was open to the public, or the actor is licensed or privileged to enter. 18 Pa. C.S. § 3502(b). Stated simply, "[a] person is guilty of burglary if he or she enters a building or occupied structure with the intent to commit a crime therein, unless he or she is licensed or privileged to enter." *Lambert*, 795 A.2d at 1015.

The intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. ***Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based on the totality of circumstances.*** The Commonwealth is not required to allege or prove what particular crime a defendant intended to commit after his forcible entry into the private residence.

14

*Id.* at 1022 (internal citations omitted; emphasis supplied).

The Commonwealth proved beyond a reasonable doubt each element of Burglary. The Commonwealth first established that Appellant entered a building not adapted for overnight accommodations: Destiny Belle's garage. Appellant himself admitted that he entered Ms. Belle's garage in the middle of the night, and further admitted that he entered the garage to "get away" from police officers. *D.H.T.*, February 11, 2016 at 67, 79, 82-83. Appellant did not raise any defense to Burglary, and the record reflects that no defense exists. Ms. Belle testified that she had not given Appellant permission to be in her garage on that night, no one had permission to be in her garage that night, her garage was not open to the public, and her garage was not abandoned. *Id.* at 35-37. Appellant himself admitted that he did not have permission to enter the garage. *Id.* at 83. The Commonwealth was not required to allege or prove what particular crime Appellant intended to commit after his entrance by criminal means. *Lambert*, 795 A.2d at 1022. The record reflects that Appellant entered the garage in the middle of the night without license, privilege, or permission. These actions permit the inference that Appellant intended a criminal purpose. *See Lambert, supra.* For these reasons, Appellant's argument that there was insufficient evidence for Burglary lacks merit.

A person commits Criminal Trespass in violation of 18 Pa. C.S. § 3503(a)(1)(i) when he, knowing that he is not licensed or privileged to do so, "enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof." 18 Pa. C.S. § 3503(a)(1)(i). It is a defense to Criminal Trespass if the building or structure was abandoned, the premise was open to the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises, or the actor reasonably

15

believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain. 18 Pa. C.S. § 3503(d).

The Commonwealth proved beyond a reasonable doubt each element of Criminal Trespass. Again, the Commonwealth established that Appellant entered a building: Destiny Belle's garage. Appellant himself admitted that he entered Ms. Belle's garage in the middle of the night. *D.H.T.*, February 11, 2016 at 67. Ms. Belle testified that her garage was not abandoned, that no one was permitted to be in her garage, and specifically Appellant was not permitted to be in her garage. *Id.* at 35-37. Appellant did not testify that he thought that Ms. Belle would permit him to be in her garage in the middle of the night. In fact, Appellant admitted that he did not have permission to enter the garage that night. *Id.* at 83. Therefore, no defense to Criminal Trespass is present in this case. Consequently, Appellant's second insufficiency of evidence claim lacks merit.

A person commits the crime of receiving stolen property in violation of 18 Pa. C.S. § 3925(a) when "he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." 18 Pa. C.S. § 3925(a). "Receiving" is defined as "acquiring possession, control or title, or lending on the security of the property." 18 Pa. C.S. § 3925(b). "To convict [A]ppellant of theft by receiving stolen property, the Commonwealth was required to prove beyond a reasonable doubt that the car had been stolen, that [A]ppellant had been in possession of it, and that he had known or had reason to know it was stolen." *In re Scott*, 566 A.2d 266, 267 (Pa. Super. Ct. 1989).

The Commonwealth proved beyond a reasonable doubt each element of receiving stolen property. First, the Commonwealth established that the vehicle was stolen. The Commonwealth

16

offered testimony to prove that Latasha Barnett was the owner of the Ford Explorer in question. Officer Carducci testified that the vehicle identification number from the Ford Explorer that he gave chase to matched the vehicle identification number from the vehicle that Latasha Barnett reported stolen. *D.H.T.*, February 4, 2016 at 18. Second, the Commonwealth proved that Appellant was in joint and constructive possession of the stolen Ford Explorer. The evidence reflects that Appellant was the passenger in the Ford Explorer. In fact, Appellant himself admitted that he was the passenger in the Ford Explorer. *D.H.T.*, February 11, 2016 at 84. Additionally, Appellant was in possession of Latasha Barnett's pill bottle, which she testified she kept in the center console of her Ford Explorer. *Id.* at 49. The fact that Appellant had the pill bottle illustrates that he had dominion and control over the vehicle under a theory of joint and constructive possession. Third, the Commonwealth established that Appellant knew that the vehicle was stolen. Appellant admitted on the stand that he knew the Ford Explorer was stolen. *Id.* at 84.

Appellant has argued that he cannot be guilty of receiving stolen property because he was only a passenger in the stolen vehicle and did not drive the stolen vehicle. This argument is without legal merit. The case *sub judice* is almost factually identical to *In re Scott, supra.* In *Scott*, police officers observed a car speeding, going through a stop sign, and ultimately striking two parked vehicles. 566 A.2d at 267. The driver and the passenger of the vehicle leaped from the vehicle and ran in different directions. *Id.* Officer Panikowski pursued the passenger of the vehicle as he ran down an alley. *Id.* Officer Panikowski lost sight of the passenger, but moments later saw the passenger walking towards him. *Id.* Officer Panikowski apprehended the passenger, who he identified as Andre Scott. *Id.* The vehicle was found to have been stolen. *Id.*

17

Scott testified that he had not been a passenger in the vehicle and had not run from the police. *Id.* Scott was adjudicated delinquent for, *inter alia*, receiving stolen property. *Id.* at 266.

Since there was no evidence that Scott had been driving the stolen vehicle, the Commonwealth contended that Scott had been in joint or constructive possession of the vehicle. *Id.* at 267. The Superior Court held that it was not fatal to the Commonwealth's case if they could not prove that a passenger in a stolen vehicle actually drove the vehicle. *Id.* at 268. In *Scott* the Court stated that where "the trier of fact finds that appellant was either driving or riding in a vehicle he knew was stolen" and "attempted to escape with his companion... there is a sufficient basis for the fact finder to apply the doctrine of joint possession, which is appropriate when the '...totality of the circumstances justify a finding that all of the occupants of the vehicle were acting in concert.'" *Id.* (citing to *Commonwealth v. Murray*, 371 A.2d 910 (Pa. Super. Ct. 1977)). "Under this doctrine, **it is immaterial that appellant may not have been behind the wheel of the stolen vehicle**." *Id.* (emphasis supplied). The *Scott* Court went on to state that: "[W]here a passenger in a stolen vehicle flees for the purpose of avoiding arrest, a fact finder may infer therefrom the dominion and guilty knowledge necessary to convict." *Id.* at 269. Based on these standards, the Superior Court held that there was sufficient evidence to convict Scott of theft by receiving stolen property. *Id.*

*Scott* makes clear that a passenger of a vehicle can be convicted of theft by receiving stolen property. In this case, Appellant was in joint or constructive possession of stolen the Ford Explorer. Appellant, like Scott, fled from the vehicle to avoid arrest. Appellant admitted that he was trying to "get away" from the police officers. *D.H.T.*, February 11, 2016 at 83. This fleeing allows the fact finder to infer guilty knowledge. *See In re Scott*, 566 A.2d at 266. However, this inference is not even necessary in this case because Appellant admitted that he knew the vehicle

18

he was a passenger in was stolen. *D.H.T.*, February 11, 2016 at 83-84. Appellant had the dominion and guilty knowledge necessary to convict him of theft by receiving stolen property. Thus, there was sufficient evidence to support Appellant's adjudication and his claim of insufficiency thereby warrants dismissal.

### B. Restitution

In his second issue raised on appeal, Appellant argues:

Appellant avers and believes that the trial court erred when it determined that Appellant owed restitution for damages to the motor vehicle, for damages to any tangible property located within the motor vehicle (except with regards to Allegations 18 and 19), and/or for damages to any tangible property not located in the motor vehicle (except with regards to Allegations 18 and 19), especially with the trial court's finding that Appellant was adjudicated delinquent at Allegation 16 (Receiving Stolen Property).

App.'s 1925(B) Statement at ¶ 2.

The Pennsylvania Supreme Court has held:

[O]ne of the purposes of the Juvenile Act is to hold children accountable for their behavior. Accordingly, the Juvenile Act authorizes the court to "order [ ] payment by the child of reasonable amounts of money as fines, costs or restitution as deemed appropriate as part of the plan of rehabilitation concerning the nature of the acts committed and the earning capacity of the child." 42 Pa.C.S.A. § 6352, Disposition of delinquent child, (a) General rule.-(5). Consistent with the protection of the public interest and the community, the rehabilitative purpose of the Juvenile Act is attained through accountability and the development of personal qualities that will enable the juvenile offender to become a responsible and productive member of the community. Thus, the policies underlying the Juvenile Act and its restitution provision, as well as the plain language of Section 6352, serve to invest the juvenile court with a broad measure of discretion to apportion responsibility for damages based upon the nature of the delinquent act and the earning capacity of the juvenile.

19

*In re M.W.*, 725 A.2d 729, 732–33 (Pa. 1999). Trial courts have broad discretion in awarding restitution. *In re D.G.*, 114 A.3d 1091, 1098 (Pa. Super. Ct. 2015). "In reviewing an order of restitution, discretion is abused where the order is speculative or excessive or lacks support in the record." *Id.* at 1097.

Appellant is not objecting to the calculation of restitution that he was ordered to pay, but rather is objecting to the fact that he has to pay any restitution other than for the pill bottle. Counsel for Appellant has never raised an objection this Court's calculation of the amount of restitution. For the reasons set forth below, Appellant's argument that he is not responsible for any restitution other than for the pill bottle is without merit.

The Court acted within its broad discretion in awarding restitution in this case. Ms. Barnett's Ford Explorer was totaled when it hit a tree during the police chase on January 18, 2016. D.H.T. February 11, 2016 at 47. As recognized previously, this Court found Appellant responsible for Receiving Stolen Property of the Ford Explorer. Additionally, a number of items contained in the Ford Explorer were damaged or never found, including: jewelry (bangles and three rings), $250.00 cash, two booster seats, 40 caliber clip with ammunition, two DS XL hand games, two RCA portable televisions, and kids games. These were itemized by the victim, Latasha Barnett, and the receipts were set forth on the record. *Dispositional Transcript ("D.T.")*, February 23, 2016 at 10-12. The Court was also provided receipts of items documenting the amount of loss to Ms. Barnett. The Commonwealth argued that the loss to the victim was $3,241.99, and that Appellant should be responsible for half ($1,620.99). *Id.* at 10-12, 25. After hearing arguments from Attorney Neenan and Attorney Checque at the February 23, 2016 Dispositional Hearing, the Court ordered Appellant to pay $1,620.99. *Id.* at 10-12, 25-26.

20

However, as stated on the record, the Court reviewed the receipts again and on February 25, 2016 modified the restitution order and lowered the amount of restitution to $1,361.00. *See* February 25, 2016 Order attached as Exhibit 1. This illustrates the Court's willingness to be fair and not arbitrary in its award. This amount also signified that this adjusted loss amount was half of the total loss as determined by the Court. The total loss was to be split with Appellant's co-defendant, J.G. Restitution is within the sound discretion of the Court. *See In re D.G., supra.* This record is saturated with facts illustrating that this Court considered not only the statements of the victim regarding her loss, but also receipts admitted by the Commonwealth to support the value of the items which were missing. The Court also reduced the value of the items and, out of fairness to Appellant, only ordered he pay half of the amount as opposed to holding him jointly and severally liable. The Court also considered Appellant's ability to pay and placed him at Loysville where he would be able to earn restitution. *D.T.* at 32, 34.

As discussed above, there was sufficient evidence to adjudicate Appellant delinquent for theft by receiving stolen property in regards to the motor vehicle. Appellant exercised dominion and control over the Ford Explorer and the items in the Ford Explorer. Accordingly, it was appropriate that Appellant pay a one-half share of the restitution for the damages to the motor vehicle and for the items located within the motor vehicle at the time of the theft. The amount of $1,361.00 represents a fair and reasonable amount for Appellant to pay as a foreseeable consequence of his criminal actions regarding the Receiving Stolen Property of the vehicle. This amount reasonably accounts for the victim's loss, and is an adequate measure of accountability for Appellant. Accordingly, this claim is without merit.

21

## C.    Placement

In his third and final issue, Appellant states:

Appellant avers and believes that the trial court erred when it determined that Appellant's best placement option was Loysville Youth Development Center (YDC) near Loysville, Pennsylvania, which is further from the Juvenile's home county than other placements that could accomplish the same "treatment, supervision and rehabilitation" goals such as George Junior Republic near Grove City, Pennsylvania, especially in this particular case as Juvenile's mother and sisters visited Juvenile on a daily basis while Juvenile was detained and/or the denial process was ongoing.

App.'s 1925(B) Statement at ¶ 3.

The Juvenile Act "grants the juvenile court broad discretion in determining the appropriate disposition for a delinquent child," which the Superior Court will not disturb absent a manifest abuse of discretion. *In re D.C.D.*, 124 A.3d 736, 739 (Pa. Super. Ct. 2015), *appeal granted*, 134 A.3d 50 (Pa. 2016). If a child is found to be delinquent, the Court may commit "the child to an institution, youth development center, camp, or other facility for delinquent children operated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare." 42 Pa. C.S. § 6352(a)(3).

In placing Appellant at Loysville Youth Development Center, the Court considered Appellant's need for treatment, supervision, and rehabilitation, including his need for a structured environment. The current acts that Appellant was adjudicated delinquent on are serious crimes. Three of the acts for which Appellant was adjudicated delinquent are felonies: Burglary (Allegation 14), Criminal Trespass (Allegation 15), and Receiving Stolen Property (Allegation 16). Moreover, Appellant had committed six past

22

delinquent acts: Defiant Trespass (in violation of 18 Pa. C.S. § 3505(b)(ii)),[4] Simple Assault (in violation of 18 Pa. C.S. § 2701(a)(1)),[5] Harassment (in violation of 18 Pa. C.S. § 2709(a)(1)),[6] Disorderly Conduct (in violation of 18 Pa. C.S. § 5503(a)(3)),[7] Terroristic Threats (in violation of 18 Pa. C.S. § 2706(a)(1)),[8] and Disorderly Conduct (in violation of 18 Pa. C.S. § 5503(a)(1)).[9] In fact, Appellant had previously been placed out of his home for acts of delinquency. On August 11, 2015, Appellant was placed at the Cornell Abraxas Leadership Development Program (hereinafter "Abraxas"). It is not lost on the Court that Appellant had been discharged from Abraxas on December 12, 2015, just over a month before he committed the delinquent acts that are the subject of this appeal. *D.T.* at 2.

Also in this matter, the Court indicated that it had read and considered the Court Summary and made it part of the record. *Id.* at 3. The Court considered that Appellant needed a program with a strong educational component, which Loysville offers. *Id.* at 32, 34. The Court also considered that Appellant would be able to earn restitution at Loysville. *Id.* at 32, 34. The Court did take into account Appellant's request to be placed closer to home so that his family could visit him. *Id.* at 33-34. The Court ordered that Appellant remain at Loysville for only two to three months, with a possible transition to George Junior Republic if Appellant was on positive status at Loysville. *Id.* at 38. Again, the Court considered in great detail the juvenile's need for treatment, supervision, and rehabilitation, and balanced those considerations with the need to protect the

---

[4] At Juvenile Docket 216 of 2014.
[5] At Juvenile Docket 93 of 2015.
[6] At Juvenile Docket 93 of 2015.
[7] At Juvenile Docket 295 of 2015.
[8] At Juvenile Docket 322 of 2015.
[9] At Juvenile Docket 322 of 2015.

23

community and to account for the impact on the victim and the need to financially compensate her. Accordingly, the Court did not abuse its broad discretion in placing Appellant at Loysville.

## CONCLUSION

For the reasons set forth above, R.M.'s appeal should be dismissed.

BY THE COURT:

Hon. John J. Trucilla, President Judge

cc: Jonathan W. Neenan, Esquire, Assistant District Attorney
Jason A. Checque, Esquire
Robert J. Blakely, Chief Juvenile Probation Officer

24